Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| JOHN EDWARD HERZOG<br><br>Recurrido<br><br>V.<br><br>DEWBERRY ENGINEERS, INC. Y OTROS<br><br>Peticionarios | KLCE202301468 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Caso Núm.: SJ2020CV03636<br><br>Sobre: Caída, Despido Injustificado (Ley Núm. 80), Ley de Represalia en el Empleo (Ley Núm. 115-1991) |

Panel integrado por su presidente; el Juez Rivera Colón, la Juez Lebrón Nieves y el Juez Rodríguez Flores

*Lebrón Nieves, Juez Ponente*

## SENTENCIA

En San Juan, Puerto Rico, a 28 de febrero de 2024.

El 27 de diciembre de 2023, compareció ante este Tribunal de Apelaciones, Dewberry Engineers, Inc. (en adelante, DEI), Dewberry and Davis, Inc. (en adelante, DDI) y The Dewberry Companies (en conjunto, Dewberry o parte peticionaria), mediante *Petición de Certiorari.* En la misma, nos solicita que revoquemos la *Resolución* emitida el 6 de noviembre de 2023 y notificada el 7 de noviembre de 2023, por el Tribunal de Primera Instancia, Sala Superior de Bayamón. Mediante el aludido dictamen, el foro *a quo* declaró No Ha Lugar la *Moción de Sentencia Sumaria* presentada por la parte peticionaria, por entender que los documentos acompañados con la moción eran insuficientes para resolver sumariamente la causa de acción, ya que existían controversias que debían ser dirimidas en un juicio plenario.

Número Identificador

SEN2024 _____

Por los fundamentos que expondremos a continuación, *expedimos* el recurso de *Certiorari* y confirmamos la determinación recurrida.

**I**

El recuso de epígrafe tiene su origen en una *Querella* incoada el 14 de julio de 2020 por el señor John Edward Herzog (en adelante, señor Herzog o parte recurrida) al amparo del procedimiento sumario que provee la Ley Núm. 2 de 17 de octubre de 1961, 32 LPRA sec. 3118 *et seq.*, en la cual reclamó despido ilegal bajo la Ley Núm. 45, *infra*; despido en represalia bajo la Ley Núm. 115, *infra*; daños y perjuicios bajo el Art. 1802 del Código Civil de 1930, en la modalidad de una reclamación contra un patrono no asegurado[1]; despido injustificado bajo la Ley Núm. 80, *infra*; y compensación adeudada por horas extras y periodo de tomar alimentos bajo la Ley Núm. 379, *infra.*

En la *Querella*, la parte recurrida adujo que, fue reclutado por Dewberry en junio de 2018, para trabajar con NISTAC E, LLC. (en adelante, NISTAC) en un proyecto de recuperación de desastre, contratado por la Agencia para el Manejo de Emergencias de los Estados Unidos (en adelante, FEMA), quien requirió que se movilizaran recursos a Puerto Rico y se proveyeran empleados profesionales y técnicos, que trabajaran en la recuperación de la Isla luego del paso del huracán María. Alegó que, el 6 de abril de 2019, mientras se encontraba en horas laborables, sufrió una caída al bajar unas escaleras en el centro de FEMA, en donde ubicaba la oficina de su patrono. Como consecuencia de la caída, sufrió una fractura de muñeca, por lo que, fue enyesado y recibió terapias de rehabilitación. Asimismo, acotó que, aun teniendo conocimiento

---

[1] El derecho aplicable en el caso de epígrafe se remite al Código Civil de Puerto Rico de 1930, 31 LPRA ant. sec. 5141, puesto que, los hechos que dan base a esta causa de acción tuvieron su lugar antes de la aprobación del nuevo Código Civil de Puerto Rico, Ley 55-2020, según enmendado.

sobre el accidente, la parte peticionaria no refirió el incidente a la Corporación del Fondo del Seguro del Estado (en adelante, CFSE) ni rindió el informe patronal, según requerido por la Ley Núm. 45, *infra*. Alegó, además, que como empleado no exento nunca se le compensó por las horas que trabajó en exceso; y que disfrutaba de un periodo de treinta (30) minutos, a pesar de que el patrono no gestionó el acuerdo para la reducción del periodo de tomar alimentos, conforme lo dispuesto en la Ley Núm. 379, *infra*.

El 3 de septiembre de 2020, la parte peticionaria presentó su *Contestación a la Querella*, en la cual, negó las alegaciones esbozadas por la parte recurrida, y levantó varias defensas afirmativas. Entre estas, que el señor Herzog era un empleado exento al cual no le aplicaban las disposiciones de las leyes invocadas en la *Querella*, y que Dewberry poseía inmunidad patronal en virtud del Defense Base Act (DBA), 42 USC sec. 1651 *et seq*. Posteriormente, presentó una *Contestación Enmendada a la Querella*.[2]

Acaecidas varias incidencias procesales, innecesarias pormenorizar, el 4 de noviembre de 2020, el foro primario ordenó la conversión del caso al procedimiento ordinario. Así las cosas, luego de concluido el descubrimiento de prueba, el 20 de enero de 2023, la parte peticionaria presentó la *Moción de Sentencia Sumaria*, en la que solicitó la desestimación de todas las causas de acción presentadas en su contra. A su vez, estableció ciento veintiún (121) hechos, respecto a los cuales entendió que no existía controversia. En igual fecha, la parte recurrida presentó una *Moción en Solicitud de Sentencia Parcial* y estableció ciento dieciocho (118) hechos, respecto a los cuales, a su juicio, no existían controversias de hechos materiales. En respuesta, la parte peticionaria presentó su

---

[2] Dicha *Contestación Enmendada a la Querella* fue presentada el 25 de enero de 2021.

*Oposición a Moción en Solicitud de Sentencia Parcial* el 13 de febrero de 2023. Consecuentemente, la parte recurrida presentó su *Moción en Oposición a Moción de Sentencia Sumaria.*[3]

A tales efectos, el 6 de noviembre de 2023, notificada el 7 de noviembre de 2023, la primera instancia judicial emitió una *Resolución,* en la cual, declaró No Ha Lugar las solicitudes de sentencia sumaria presentadas por las partes. Así pues, determinó que los hechos presentados por las partes, así como los documentos acompañados para sustentar sus argumentos, eran insuficientes para resolver sumariamente las causas de acción. De esta manera, el foro primario estableció cincuenta y cinco (55) determinaciones de hechos incontrovertidos, y diez (10) determinaciones de hechos en controversia.

En desacuerdo con la determinación, el 22 de noviembre de 2023, la parte peticionaria presentó *una Solicitud de Determinaciones de Hechos Adicionales y Enmiendas y Reconsideración de Resolución.* En esta, solicitó que se acogieran como incontrovertidos treinta y cinco (35) hechos adicionales y que se enmendaran otros hechos incontrovertidos en la *Resolución.* Solicitó, además, que se reconsiderara la determinación, a los fines de desestimar ciertas causas de acción sumariamente. En contestación a la misma, el Tribunal de Primera Instancia emitió *Resolución* el 24 de noviembre de 2023 y notificada el 28 de noviembre de 2023, en la cual la declaró No Ha Lugar.

Aún inconforme, la parte peticionaria acudió ante este foro revisor el 27 de diciembre de 2023, mediante recurso de *certiorari* y formuló los siguientes señalamientos de error:

> **Primer Error:** Erró el TPI al no tomar como incontrovertidos los hechos presentados por Dewberry en su <u>Sumaria</u> que fueron admitidos por el demandante en su <u>Oposición</u> y estipulados por las partes, así como

---

[3] Dicha oposición se presentó el 13 de febrero de 2023.

los que no fueron debidamente controvertidos por el demandante.

**Segundo Error:** Erró el TPI al declarar No Ha Lugar la <u>Moción de Sentencia Sumaria</u> de Dewberry por encontrar que la prueba sometida en apoyo era insuficiente para resolver todas las controversias de derecho[,] aun cuando las mismas son separables y los hechos incontrovertidos son suficientes para dirimir todas las controversias del caso por la vía sumaria.

El 29 de enero de 2024, compareció la parte recurrida mediante *Oposición a Expedición del Auto Certiorari*.

Con el beneficio de la comparecencia de las partes procedemos a resolver.

## II

### A. Certiorari

El certiorari es un recurso extraordinario mediante el cual un tribunal de jerarquía superior puede revisar discrecionalmente una decisión de un tribunal inferior. *Caribbean Orthopedics v. Medshape et al.*, 207 DPR 994, 1004 (2021); *Pueblo v. Rivera Montalvo*, 205 DPR 352, 372 (2020); *Medina Nazario v. McNeil Healthcare LLC*, 194 DPR 723, 728-729 (2016); *IG Builders et al. v. BBVAPR*, 185 DPR 307, 337-338 (2012); *Pueblo v. Díaz de León*, 176 DPR 913, 917 (2009). Ahora bien, tal "discreción no opera en lo abstracto. A esos efectos, la Regla 40 del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R. 40, dispone los criterios que dicho foro deberá considerar, de manera que pueda ejercer sabia y prudentemente su decisión de atender o no las controversias que le son planteadas". *Torres Martínez v. Torres Ghigliotty*, 175 DPR 83, 97 (2008); *Pueblo v. Rivera Montalvo*, supra, pág. 372. La precitada Regla dispone lo siguiente:

> El Tribunal tomará en consideración los siguientes criterios al determinar la expedición de un auto de certiorari o de una orden de mostrar causa:
>
> (A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.

(B)   Si la situación de hechos planteada es la más indicada para el análisis del problema.

(C)   Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.

(D)   Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.

(E)   Si la etapa de los procedimientos en que se presenta el caso es la más propicia para su consideración.

(F)   Si la expedición del auto o de la orden de mostrar causa no causa un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.

(G)   Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.[4]

No obstante, "ninguno de los criterios antes expuestos en la Regla 40 del Reglamento del Tribunal de Apelaciones, *supra*, es determinante, por sí solo, para este ejercicio de jurisdicción, y no constituye una lista exhaustiva". *García v. Padró*, 165 DPR 324, 327 (2005). Por lo que, de los factores esbozados "se deduce que el foro apelativo intermedio evaluará tanto la corrección de la decisión recurrida, así como la etapa del procedimiento en que es presentada; esto, para determinar si es la más apropiada para intervenir y no ocasionar un fraccionamiento indebido o una dilación injustificada del litigio". *Torres Martínez v. Torres Ghigliotty*, supra, pág. 97.

Por otro lado, a partir del 1 de julio de 2010, se realizó un cambio respecto a la jurisdicción del Tribunal Apelativo para revisar los dictámenes interlocutorios del Tribunal de Primera Instancia mediante recurso de *certiorari*. A tal fin, la Regla 52.1 de Procedimiento Civil, *supra*, dispone, en su parte pertinente, lo siguiente:

El recurso de *certiorari* para revisar resoluciones u órdenes interlocutorias dictadas por el Tribunal de Primera Instancia, solamente será expedido por el

---

[4] 4 LPRA Ap. XXII-B, R. 40.

Tribunal de Apelaciones cuando se recurra de una resolución u orden bajo las Reglas 56 y 57 o de la denegatoria de una moción de carácter dispositivo. No obstante, y por excepción a lo dispuesto anteriormente, el Tribunal de Apelaciones podrá revisar órdenes o resoluciones interlocutorias dictadas por el Tribunal de Primera Instancia cuando se recurra de decisiones sobre la admisibilidad de testigos de hechos o peritos esenciales, asuntos relativos a privilegios evidenciaros, anotaciones de rebeldía, en casos de relaciones de familia, en casos que revistan interés público o en cualquier otra situación en la cual esperar a la apelación constituiría un fracaso irremediable de la justicia. Al denegar la expedición de un recurso de *certiorari* en estos casos, el Tribunal de Apelaciones no tiene que fundamentar su decisión. (Énfasis nuestro). Regla 52.1 de Procedimiento Civil, *supra.*

Según se desprende de la precitada Regla, este foro apelativo intermedio podrá revisar órdenes interlocutorias discrecionalmente, cuando se recurre de decisiones sobre la admisibilidad de testigos de hechos o peritos esenciales, asuntos relativos a privilegios evidenciarios, anotaciones de rebeldía o en casos de relaciones de familia o que revistan interés público, o en aquellas circunstancias en las que revisar el dictamen evitaría un irremediable fracaso de la justicia, entre otras contadas excepciones.

El certiorari, como recurso extraordinario discrecional, debe ser utilizado con cautela y solamente por razones de peso. *Pérez v. Tribunal de Distrito*, 69 DPR 4, 7 (1948). Este procede cuando no está disponible la apelación u otro recurso que proteja eficaz y rápidamente los derechos del peticionario. *Pueblo v. Tribunal Superior*, 81 DPR 763, 767 (1960). Nuestro Tribunal Supremo ha expresado también que "de ordinario, el tribunal apelativo no intervendrá con el ejercicio de la discreción de los tribunales de instancia, salvo que se demuestre que hubo un craso abuso de discreción, o que el tribunal actuó con prejuicio o parcialidad, o que se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo, y que nuestra intervención en esa etapa evitará un perjuicio sustancial". *Zorniak Air Servs. v. Cessna*

*Aircraft Co.*, 132 DPR 170, 181 (1992*); Rivera y otros v. Bco. Popular,* 152 DPR 140, 155 (2000).

### B. Sentencia Sumaria

La sentencia sumaria es un mecanismo procesal disponible en nuestro ordenamiento que nos permite resolver controversias sin que se requiera llegar a la etapa de juicio.[5] *Segarra Rivera v. Int'l Shipping et al.*, 208 DPR 964 (2022); *Serrano Picón v. Multinational Life Ins.,* 2023 TSPR 118, 212 DPR ___ (2023); *González Meléndez v. Mun. San Juan,* 2023 TSPR 95, 212 DPR ___ (2023); *Birriel Colón v. Econo y Otros,* 2023 TSPR 120, 213 DPR ___ (2023) *Delgado Adorno v. Foot Locker Retail,* 208 DPR 622 (2022). La sentencia sumaria está regida por la Regla 36 de Procedimiento Civil de 2009, 32 LPRA Ap. V, R. 36, la cual desglosa los requisitos específicos con los que debe cumplir esta norma procesal. *Lugo Montalvo v. Sol Meliá Vacation,* 194 DPR 209, 224 (2015); *Rosado Reyes v. Global Healthcare Group, LCC.,* supra, pág. 290.

Ante la ausencia de una controversia sustancial y real sobre hechos materiales, sólo resta aplicar el derecho pertinente a la controversia. *Serrano Picón v. Multinational Life Ins.,* supra, pág. 6. Cuando se habla de hechos materiales, nos referimos a aquellos que pueden determinar el resultado de la reclamación, de conformidad con el derecho sustantivo aplicable. Así pues, el propósito de la sentencia sumaria es facilitar la pronta, justa y económica solución de los casos que no presenten controversias genuinas de hechos materiales.[6] *Alicea Pérez v. Coop. Seg. Múlt. et al.*, 210 DPR 71 (2022); *Segarra Rivera v. Int'l Shipping et al.,* supra, pág. 5; *Rosado Reyes v. Global Healthcare Group, LCC.,* supra, pág. 290;

---

[5] *Ramos Pérez v. Univisión,* 178 DPR 200, 213 (2010); *SLG Fernández-Bernal v. RAD-MAN et al.*, 208 DPR 310 (2021); *Rosado Reyes v. Global Healthcare Group, LCC.,* 205 DPR 796, 290 (2020).
[6] *Velázquez Ortiz v. Gobierno Mun. De Humacao,* 197 DPR 656, 662-663 (2017); *SLG Fernández-Bernal v. RAD-MAN,* supra, pág. 13; *Roldán Flores v. M. Cuebas, Inc.,* 199 DPR 664, 676 (2018).

*González Meléndez v. Mun. San Juan,* supra. Procede dictar sentencia sumaria si de las alegaciones, deposiciones y admisiones ofrecidas, en unión a las declaraciones juradas y alguna otra evidencia admisible, se acredita la inexistencia de una controversia real y sustancial respecto a algún hecho esencial y material y, además, si procede en derecho. *SLG Fernández-Bernal v. RAD-MAN*, supra, pág. 13; *Segarra Rivera v. Int'l Shipping et al.*, supra, pág. 6; *Birriel Colón v. Econo y Otros*, supra; *González Meléndez v. Mun. San Juan,* supra.[7] De la prueba adjunta a la solicitud de sentencia sumaria, deberá surgir preponderadamente la inexistencia de controversia sobre los hechos medulares del caso. *Birriel Colón v. Econo y Otros*, supra.

Cónsono con esto, en el pasado el Tribunal Supremo de Puerto Rico ha afirmado que -utilizado ponderadamente- el mecanismo de sentencia sumaria es un vehículo idóneo para descongestionar los calendarios de los tribunales y evitar el derroche de dinero y tiempo que implica la celebración de un juicio en su fondo. Véase *Carpets & Rugs v. Tropical Reps.*, 175 DPR 615 (2009); *Padín v. Rossi*, 100 DPR 259 (1971); *Pérez Vargas v. Office Depot*, 203 DPR 687 (2019).

La Regla 36.3 de Procedimiento Civil, 32 LPRA Ap. V, detalla el procedimiento que deben seguir las partes al momento de solicitar que se dicte una sentencia sumaria a su favor. A esos efectos, establece que una solicitud al amparo de ésta deberá incluir: (1) una exposición breve de las alegaciones de las partes; (2) los asuntos litigiosos o en controversia; (3) la causa de acción, reclamación o parte respecto a la cual es solicitada la sentencia sumaria; (4) una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las

---

[7] Véase *Lugo Montalvo v. Sol Meliá Vacation*, supra, pág. 225; *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 430 (2013).

declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal; (5) las razones por las cuales debe ser dictada la sentencia, argumentando el derecho aplicable, y (6) el remedio que debe ser concedido. 32 LPRA Ap. V. R. 36.3. *Rodríguez García v. UCA,* 200 DPR 929, 940 (2018); *SLG Fernández-Bernal v. RAD-MAN*, supra, pág. 14.

Cumplidos estos requisitos, el Tribunal Supremo de Puerto Rico expresó además en *Pérez Vargas v. Office Depot*, supra, pág. 699, que el inciso (e) de la Regla 36.3 establece lo siguiente:

> La sentencia solicitada será dictada inmediatamente si las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente y que, como cuestión de derecho, el tribunal debe dictar sentencia sumaria a favor de la parte promovente. El tribunal podrá dictar sentencia sumaria de naturaleza interlocutoria para resolver cualquier controversia entre cualesquiera partes que sea separable de las controversias restantes. Dicha sentencia podrá dictarse a favor o contra cualquier parte en el pleito. Si la parte contraria no presenta la contestación a la sentencia sumaria en el término provisto en esta regla, se entenderá que la moción de sentencia sumaria queda sometida para la consideración del tribunal. 32 LPRA Ap. V, R. 36.3(e).

La sentencia sumaria no procederá en las instancias que: (1) existan hechos materiales y esenciales controvertidos; (2) haya alegaciones afirmativas en la demanda que no han sido refutadas; (3) surja de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material y esencial; o (4) como cuestión de derecho, no proceda. *SLG Fernández-Bernal v. RAD-MAN*, supra, pág. 14; *Serrano Picón v. Multinational Life Ins.,* supra.

De conformidad con lo antes indicado, nuestra Máxima Curia ha expresado que, el oponente debe controvertir la prueba

presentada con evidencia sustancial y no puede simplemente descansar en sus alegaciones *Birriel Colón v. Econo y Otros,* supra; *Ramos Pérez v. Univisión,* 178 DPR 200, 215-216 (2010). Las meras afirmaciones no bastan. *Íd.* "Como regla general, para derrotar una solicitud de sentencia sumaria la parte opositora debe presentar contradeclaraciones juradas y contradocumentos que pongan en controversia los hechos presentados por el promovente". *Ramos Pérez v. Univisión,* supra, pág. 215. (Cita omitida). *Roldán Flores v. M. Cuebas, Inc.,* supra, pág. 677. Además, se le exige a la parte que se oponga ciertas exigencias adicionales. Primeramente, deberá presentar una relación concisa y organizada de los hechos esenciales y pertinentes que, a su juicio, estén en controversia, citando específicamente los párrafos según fueron enumerados por el promovente de la moción. *SLG Fernández-Bernal v. RAD-MAN,* supra, pág. 15. También, deberá enumerar los hechos que no estén en controversia, con indicación de los párrafos o páginas de las declaraciones juradas u otra prueba admisible donde se establezcan estos. *Íd.* En adición, deberá esbozar las razones por las cuales no se debe dictar sentencia sumaria, argumentando el derecho aplicable. *Íd.*

Si el oponente no controvierte los hechos propuestos de la forma en la que lo exige la Regla 36.3 de Procedimiento Civil, *supra,* se podrán considerar como admitidos y se dictará la Sentencia Sumaria en su contra, si procede. *Roldán Flores v. M. Cuebas, Inc.,* supra, pág. 677.

Respecto a la revisión de las sentencias sumarias, el foro apelativo deberá utilizar los mismos criterios que el Tribunal de Primera Instancia. *Meléndez González et al. v. M. Cuebas,* supra, pág. 679; *González Meléndez v. Mun. San Juan,* supra. Nuestro Máximo Foro ha sido claro en que, [l]os tribunales apelativos estamos limitados a: (1) considerar los documentos que se

presentaron ante el foro de primera instancia; (2) determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, y (3) comprobar si el derecho se aplicó de forma correcta. *Birriel Colón v. Econo y Otros*, supra.  De acuerdo a lo anterior, el foro apelativo está obligado a examinar *de novo* la totalidad de los documentos incluidos en el expediente de la forma más favorable al promovido.  *Íd.   Serrano Picón v. Multinational Life Ins.*, supra; *Meléndez González et al. v. M. Cuebas*, supra, pág.  679.

### C. *Ley de Compensaciones por Accidentes en el Trabajo*

Mediante la aprobación de la Ley del Sistema de Compensaciones por Accidentes en el Trabajo, Ley Núm. 45 de 18 de abril de 1935, según enmendada, 11 LPRA sec. 1 *et seq.*, se crearon el Fondo del Seguro del Estado y la Comisión Industrial de Puerto Rico, con el propósito de asegurar al trabajador empleado una compensación justa y rápida por los daños sufridos a consecuencia de accidentes o enfermedades acaecidas en el desempeño de su trabajo. *Guzmán y otros v. ELA*, 156 DPR 693, 727 (2002). La aprobación de esta legislación surgió como resultado de mutuas concesiones entre los obreros, cuya fuerza era limitada, y los patronos quienes enfrentaban una intensa presión de parte de sus obreros. *Guzmán y otros v. ELA*, supra, citando a R. E. Bernier, *La constitucionalidad de dar inmunidad al patrono estatutario cuando el contratista independiente se ha asegurado a través del Fondo del Seguro del Estado*, 53(1) Rev. Col. Abog. 53 (1992). La ley estableció un esquema de aportación patronal compulsoria a un fondo estatal de seguro, con el fin de compensar lesiones que provengan de cualquier acto o función del obrero, siempre que sean inherentes a su trabajo, o que ocurran en el curso de éste. *González v. Multiventas*, 165 DPR 873, 880-881 (2005); *Martínez Rodríguez v. Bristol Myers, Inc.*, 147 DPR 383, 393 (1999); *Odriozola v. Superior Cosmetic Distributors Corp.*, 116 DPR 485, 499 (1985).

Conforme al esquema de la CFSE, el patrono asume el riesgo de la lesión, entendiéndose que su responsabilidad es absoluta. Siendo así, el empleado que se acoge a la CFSE por un accidente del trabajo no tendrá que probar que hubo negligencia de parte del patrono como causa de la lesión o enfermedad, por lo que es inmaterial que el accidente haya ocurrido a consecuencia de la negligencia del patrono, de un tercero, o hasta del propio empleado. *Guzmán y otros v. ELA,* supra, pág. 729. Es decir, el empleado recibe compensación independientemente de quién sea responsable por el accidente. La legislación evita que el empleado tenga que enfrentar las dificultades de una reclamación civil ante los tribunales, donde tendría que probar el elemento de culpa o negligencia. *Guzmán y otros v. ELA,* supra, pág. 730. A cambio de esta protección, el patrono asegurado recibe inmunidad contra cualquier reclamación civil en daños y perjuicios que pueda entablar el empleado lesionado en su contra. *Id. González v. Multiventas*, supra, págs. 881-882.

Por otra parte, es vasta la jurisprudencia del Tribunal Supremo de Puerto Rico que destaca el carácter absoluto de la inmunidad patronal. Ni siquiera la negligencia crasa de parte del patrono quiebra esta inmunidad, y es el remedio provisto por la CFSE el único remedio disponible para el empleado lesionado. *Guzmán y otros v. ELA.,* supra, pág. 730; *Hernández Sánchez v. Bermúdez & Longo, S.E.,* 149 DPR 543, 549 (1999); *Admor., FSE v. Flores Hnos. Cement Prods., Inc.,* 107 DPR 789, 796 (1978). No obstante, por excepción, la inmunidad patronal no aplica en aquellas situaciones en las que el daño sufrido por el obrero se deba a un acto intencional o discriminatorio de parte del patrono. Ante este tipo de actuación del patrono, se le reconoce al empleado afectado una causa de acción para reclamarle civilmente a su patrono. (Citas omitidas). *González v. Multiventas*, supra, págs. 882-883.

El Art. 16 de la Ley Núm. 45, *supra,* dispone que, todo patrono de los comprendidos dentro de las disposiciones de la Ley de Compensaciones estará obligado a asegurar a sus empleados en la CFSE la compensación que estos deban recibir por lesiones, enfermedad o muerte. Cuando el patrono asegure a sus obreros y empleados de acuerdo con la ley, el derecho estatutariamente establecido para obtener compensación será el único remedio en contra del patrono y por ende gozará de inmunidad patronal.[8] Cualquier accidente que ocurra antes de verificarse el pago, será considerado como un caso de patrono no asegurado a menos que el patrono verifique el pago dentro del término fijado por el Administrador. Mientras no se haya hecho este pago por el patrono, dicho patrono no tendrá derecho a las inmunidades provistas por la Ley con respecto a las lesiones, enfermedades o muertes que pudieren ocurrir a los obreros o empleados de tal patrono durante el período que cubre el pago de dichas primas. *Íd.*

Además, en el caso de que ocurriere un accidente a un obrero o empleado cuando trabajare para un patrono que en violación de la ley no estuviere asegurado, el Administrador de la CFSE determinará la compensación que proceda más los gastos en el caso y cobrará al patrono dicha compensación y gastos para ser ingresados en el Fondo. Art. 13 de la Ley Núm. 45 de 18 de abril de 1935, *supra.*

### D. *Ley sobre Despidos Injustificados*

La Ley Núm. 80 de 30 de mayo de 1976, según enmendada, 29 LPRA sec. 185a *et seq.*, conocida como la Ley de Indemnización por Despido sin Justa Causa[9], regula las acciones relacionadas con el despido de un empleado. Tiene el propósito de proteger al

---

[8] 11 LPRA sec. 21.

[9] Destacamos que la Ley Núm. 80 fue enmendada por la Ley Núm. 4 de 2017, conocida como *Ley de Transformación y Flexibilidad Laboral*, aprobada el 26 de enero de 2017.

empleado de actuaciones arbitrarias del patrono e imponer remedios económicos que desalienten la práctica de despedir a los empleados injustificadamente. *Ortiz Ortiz v. Medtronic*, 209 DPR 759 (2022); *Romero et als. v. Cabrera Roig et als.*, 191 DPR 643, 649-650 (2014). *SLG Torres-Matundan v. Centro Patología*, 193 DPR 920, 929 (2015). *González Santiago v. Baxter Health Care*, 202 DPR 281 (2019); *Segarra Rivera v. Int'l Shipping Agency, Inc.*, 208 DPR 964, 7 (2022).

En consonancia con su propósito, dicha pieza legislativa establece que "aquellos empleados de comercio, industria o cualquier otro negocio o sitio de empleo que: (1) están contratados sin tiempo determinado; (2) reciben una remuneración, y (3) son despedidos de su cargo, sin que haya mediado una justa causa", tienen derecho al pago de una compensación por su patrono (además del sueldo devengado), típicamente denominada como la mesada. *Rodríguez Gómez v. Multinational Ins.,* 207 DPR 540, 550 (2021); *Indulac v. Unión*, 207 DPR 279, 298 (2021); *Orsini v. Srio de Hacienda*, 177 DPR 596, 620-621 (2009).

Sin embargo, es meritorio destacar que, según se ha establecido doctrinalmente, "en Puerto Rico no existe una prohibición absoluta contra el despido de un empleado. Si existe justa causa, éste puede ser despedido". *Santiago v. Kodak Caribbean, Ltd.,* 129 DPR 763, 775 (1992); *Segarra Rivera v. Int'l Shipping Agency, Inc.,* supra, pág. 7; *Rodríguez Gómez v. Multinational Ins.,* supra, pág. 549; *Ortiz Ortiz v. Medtronic*, supra, pág. 771. Por ende, la Ley Núm. 80, *supra,* no proscribe la acción del despido, sino que le impone al patrono un elemento disuasivo para no despedir al trabajador sin justa causa. *Íd.*; Véase, Luis H. Sánchez Caso, *Reflexiones sobre la Responsabilidad Civil de los Oficiales y Gerenciales en Reclamaciones de Despido o Discrimen*, 34 Rev. Jur. UIPR 183, 210-11 (2000). De no existir justa causa, el

remedio provisto es la imposición al patrono del pago de la mesada a favor del empleado. *Feliciano Martes v. Sheraton*, 182 DPR 368, 380 (2011); *Rodríguez Gómez v. Multinational Ins.,* supra, págs. 549-550; *Indulac v. Unión*, supra, pág. 298. Así, la mesada constituye el remedio exclusivo disponible para los empleados despedidos injustificadamente, siempre que no existan otras causas de acción al amparo de otras leyes que prohíban el despido y concedan otros remedios. (Citas omitidas). *Lugo Montalvo v. Sol Meliá Vacation*, supra, págs. 230-231; *Ortiz Ortiz v. Medtronic,* supra, pág. 771.

De otra parte, destacamos que, una vez un empleado insta una causa de acción contra su patrono al amparo de la Ley Núm. 80, *supra*, el patrono podrá plantear la defensa de justa causa, a base de los criterios dispuestos en la Ley Núm 80, *supra*, en su Art. 2. *González Santiago v. Baxter Healthcare of Puerto Rico*, 202 DPR 281, 291 (2019).

Asimismo, la propia Ley Núm. 80, *supra*, estatuye claramente las ocasiones en las que un patrono tendrá justa causa para desvincular a un empleado del puesto. De este modo, en su Artículo 2 reconoce que:

**Artículo 2.**

Se entenderá por justa causa para el despido de un empleado aquella que no esté motivada por razones legalmente prohibidas y que no sea producto del mero capricho del patrono. Además, se entenderá por justa causa aquellas razones que afecten el buen y normal funcionamiento de un establecimiento que incluyen, entre otras, las siguientes:

(a) Que el empleado incurra en un patrón de conducta impropia o desordenada.

(b) Que el empleado incurra en un patrón de desempeño deficiente, ineficiente, insatisfactorio, pobre, tardío o negligente. Esto incluye incumplir con normas y estándares de calidad y seguridad del patrono, baja productividad, falta de competencia o habilidad para realizar el trabajo a niveles razonables requeridos por el patrono y quejas repetidas de los clientes del patrono.

(c)    Violación reiterada por el empleado de las reglas y reglamentos razonables establecidos para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.
[…]29 LPRA sec. 185b.

Sin embargo, esas tres instancias, al igual que las demás que se enumeran en la Ley Núm. 80, *supra*, "son solo ejemplos de las posibles causas que constituyen justa causa para el despido". Esto se debe a que "el concepto justa causa es uno dinámico, que se nutre de múltiples y fluidas situaciones imposibles de prever". La Ley Núm. 80, *supra*, "no pretende, ni puede, considerar la variedad de circunstancias y normas de los múltiples establecimientos de trabajo, ser un código de conducta que contenga una lista de faltas claramente definidas y la sanción que corresponda a cada una y en cada instancia". En otras palabras, la enumeración de escenarios que se consideran justa causa contenida en la Ley Núm. 80 no es taxativa. (Citas omitidas). *SLG Torres-Matundan v. Centro Patología*, supra, pág. 930; Véase *Ortiz Ortiz v. Medtronic*, supra, pág. 773; *Indulac v. Unión*, supra, pág. 299. Las circunstancias constitutivas de justa causa, esbozadas en el Art. 2 de la Ley Núm. 80 constituyen meros ejemplos de instancias asociadas a un despido. *Íd.*

Por esa razón, los patronos están en libertad de adoptar los reglamentos y las normas razonables que estimen necesarias para el buen funcionamiento de la empresa y en las que se definan las faltas que, por su gravedad, podrían acarrear el despido como sanción. *Jusino et als. v. Walgreens*, 155 DPR 560, 573 (2001); *González Santiago v. Baxter Health Care*, supra, págs. 291-292. Según nuestro Máximo Foro, en las situaciones en las que un patrono despide a un empleado por una causal que no se encuentre enumerada en la Ley Núm. 80, *supra*, el análisis para determinar si esta constituye justa causa se apoya en el principio rector de la propia ley, contenido en el segundo párrafo de su Art. 2, *supra*, el

cual establece lo siguiente: "No se considerará despido por justa causa aquel que se hace por mero capricho del patrono o sin razón relacionada con el buen y normal funcionamiento del establecimiento". *SLG Torres-Matundan v. Centro Patología,* supra, pág. 931; *González Santiago v. Baxter Health Care*, supra, pág. 292. De igual forma, nuestro Máximo Foro ha destacado que, las violaciones de las normas del empleo constituirán justa causa para el despido en aquellas instancias en las que el patrono consiga demostrar: "(1) que las reglas establecidas para el funcionamiento del establecimiento son razonables[;] (2) que le suministró una copia escrita de dichas normas al empleado, y (3) que el empleado las violó en reiteradas ocasiones". *Ortiz Ortiz v. Medtronic,* supra, págs. 773-774, citando a *Jusino et als. v. Walgreens*, 155 DPR 560, 573 (2001).

Con esa regla como norte, y a modo de excepción, hace más de treinta y cinco años nuestra más alta instancia judicial reconoció que la Ley Núm. 80, *supra*, "no excluye de la sanción o despido en primera o única ofensa aquella falta cuya intensidad de agravio así lo requiera en protección de la buena marcha de la empresa y la seguridad de las personas que allí laboran". *Íd.* págs. 292-293 citando a *Feliciano Martes v. Sheraton*, 182 DPR 368, 383 (2011) y a *Srio. del Trabajo v. ITT*, 108 DPR 536, 543 (1979). Es decir, aunque la Ley Núm.80, *supra*, "no favorece el despido como sanción a la primera falta, ello podría considerarse justificado si dicha acción u omisión, por su gravedad y potencial de agravio, pone en riesgo la seguridad, el orden o la eficiencia que constituyen el funcionamiento del negocio". *Rivera v. Pan Pepín*, 161 DPR 681, 690 (2004) *González Santiago v. Baxter Health Care*, supra, págs. 292-293.

En esos casos particulares, "la falta o acto aislado que dé lugar al despido del empleado en primera ofensa ha de ser de tal seriedad o naturaleza que revele una actitud o un detalle de su carácter, tan lesivo a la paz y al buen orden de la empresa, que constituiría una

imprudencia esperar [a que se repita, para entonces proceder con el despido]". (Citas omitidas). *Íd.* citando a *Rivera v. Pan Pepín,* supra, pág. 690; *Indulac v. Unión,* supra, pág. 300.

### E. Ley para Establecer la Jornada de Trabajo en Puerto Rico (Periodo de tomar alimentos)

Como se sabe, en nuestro ordenamiento jurídico, las reclamaciones de salarios están revestidas del más alto interés público debido a la importancia que el pago de éstos acarrea para la subsistencia de los obreros y sus dependientes. *Rodríguez v. Syntex,* 160 DPR 364, 380 (2003).

Entre las distintas leyes protectoras del empleo vigentes actualmente, la Ley Núm. 379 de 15 de mayo de 1948, según enmendada, 29 LPRA sec. 271 *et seq.*, conocida como la Ley de Horas y Días de Trabajo, establece una jornada de trabajo y, fija los periodos de descanso, establece los deberes de los patronos, y le impone a estos, penalidades por la violación de sus disposiciones. *Colón v. Syntex,* 162 DPR 200, 206-207 (2004); 29 LPRA sec. 271 *et seq;* Ruy N. Delgado Zayas, *Apuntes para el Estudio de la Legislación Protectora del Trabajo en el Derecho Laboral Puertorriqueño,* Revisión 2001, San Juan, Ramallo.

En consonancia con lo anterior, la Ley Núm. 379, *supra,* establece, en su artículo 2, que ocho (8) horas de labor constituyen la jornada diaria de trabajo en Puerto Rico, y cuarenta (40), la jornada de trabajo semanal.[10] Por su parte, su artículo 3 dispone que son horas regulares de trabajo ocho (8) durante cualquier día de trabajo y cuarenta (40) durante cualquier semana de trabajo.[11]

---

[10] 29 LPRA. sec. 271. Originalmente, y hasta el año 1974, la ley disponía que la jornada de trabajo semanal era de cuarenta y ocho (48) horas.

[11] 29 LPRA. sec. 272. Originalmente, y hasta el año 1974, la ley disponía que eran horas regulares de trabajo cuarenta y ocho (48) durante cualquier semana.

La Ley Núm. 379, *supra*, dispone lo pertinente al periodo destinado para tomar alimentos.[12] El mencionado estatuto mantuvo la jornada laboral legal diaria en Puerto Rico en ocho horas y que estas se consideran horas regulares si se trabajan dentro de un periodo de veinticuatro (24) horas consecutivas. Permaneció inalterada, además, la disposición que establece que por cada hora extra trabajada el patrono pagará un tipo de salario igual al doble del tipo convenido para las horas regulares.

Mediante la Ley 349, *supra*, a pesar de que la duración del periodo de tomar alimentos se mantuvo en una hora, se añadió que *podía fijarse un periodo menor para conveniencia del empleado por estipulación de éste y su patrono con la aprobación del Comisionado del Trabajo* (actualmente, Secretario del Trabajo).

Se destaca que entre los propósitos de la ley se encuentra la efectiva protección de la salud, la seguridad y la vida del trabajador. *Acevedo v. P.R. Sun Oil*, supra, pág. 759. Asimismo, el conceder un periodo para tomar alimentos dentro de la jornada diaria de trabajo, persigue el proteger la salud de los empleados, concediéndoles tiempo para que puedan alimentarse y descansar. *Almodóvar vs. Cervecería India, Inc.*, 103 DPR 407, 409 (1975). La obligación de un patrono de conceder una hora, o fracción de hora, para que sus obreros tomen alimentos, presupone una interrupción en la prestación de los servicios que presta el empleado, y que éste haga uso libremente de dicho tiempo, sin que durante el mismo tenga que prestar atención, aunque sea mínima, a las obligaciones de su cargo. *Pamblanco vs. Unión Caribe*, 90 DPR 712, 720 (1964).

---

[12] La Ley Núm. 379 de 15 de mayo de 1948 derogó y sustituyó la Ley Núm. 49 de 7 de agosto de 1935, ley mediante la cual se estableció que la jornada regular de trabajo sería de ocho horas y que las horas trabajadas en exceso de dicha jornada diaria se pagarían por el patrono al tipo doble del salario que se estuviese pagando por hora al empleado. Además, se dispuso en la citada Ley 49 que, el tiempo señalado para tomar alimentos no sería menor de una (1) hora. *Acevedo v. P.R. Sun Oil Co.*, 145 DPR 752, 758 (1998).

En lo pertinente, la sección 283 de la Ley de Horas y Días de Trabajo, *supra*, establece que:

> Todo patrono fijará en un lugar visible del establecimiento, taller, fábrica, plantación, oficina o sitio de trabajo, según fuere el caso, un aviso impreso, haciendo constar el número de horas de trabajo que se exige diariamente a los empleados durante cada día de la semana, las horas de comenzar y terminar el trabajo, y la hora en que empieza y termina el período destinado a tomar los alimentos dentro de la jornada regular.

> Los períodos señalados para tomar los alimentos que ocurran dentro o fuera de la jornada regular del empleado pueden ser menores de una hora. Si por razón de conveniencia mutua para el empleado y su patrono, y por estipulación escrita de ambos, se fijare un período menor éste no podrá nunca ser menor de treinta (30) minutos, excepto para croupiers, enfermeras, enfermeros y guardianes de seguridad que podrá ser de hasta un mínimo de veinte (20) minutos. En el caso de los períodos de tomar alimentos que ocurran fuera de la jornada regular del empleado, cuando no se trabaja más de dos (2) horas después de la jornada regular, éstos podrán ser obviados mediante acuerdo escrito entre empleado y patrono, para beneficio mutuo y sin la intervención del Secretario del Trabajo y Recursos Humanos.

> [.....]

> Todo patrono que emplee o permita que un empleado trabaje durante el período destinado para tomar los alimentos vendrá obligado a pagarle por dicho período o fracción del mismo un tipo de salario igual al doble del tipo convenido para las horas regulares. En aquellos casos en que, de acuerdo a las disposiciones de esta sección, el período destinado para tomar los alimentos sea reducido a un período menor de una hora, el patrono vendrá obligado a pagar dicho tipo de salario igual al doble del tipo convenido para las horas regulares únicamente si emplea o permite que un empleado trabaje durante el período al cual ha sido reducida la hora señalada para tomar alimentos.

> [.....]

A esos efectos, la sección 282 de la misma Ley Núm. 379, establece que todo empleado que reciba una compensación menor que la fijada para el período señalado para tomar los alimentos, esto es, el doble del tipo convenido para horas regulares, "tendrá derecho a recobrar de su patrono mediante acción civil las cantidades no pagadas, más una suma igual por concepto de liquidación de daños y perjuicios, además de las costas, gastos y honorarios de abogados

del procedimiento". 29 LPRA sec. 283; *Almodóvar v. Cervecería India, Inc.*, supra, pág. 409.

En *Pamblanco v. Unión Carbide*, 90 DPR 712, 719 (1964), nuestro Tribunal Supremo resolvió que la hora para tomar alimentos no debe considerarse como una hora extra. Sobre este particular, expresó: "Si la intención del legislador hubiese sido considerar esta hora para tomar alimentos como hora extra, fácil le hubiese sido incluirla en la enumeración del Art. 4 de la Ley Núm. 379, *supra*, como lo hizo, entre otros, en el caso de las horas extras trabajadas durante el día de descanso o en aquellos días en que el establecimiento en que preste servicios deba permanecer cerrado al público". Señaló además que, el propósito legislativo fue en adición a la penalidad criminal proveer una "penalidad civil" con miras a lograr que los patronos no desatendieran la obligación que les imponía la ley de conceder a los empleados un periodo para tomar alimentos. Tampoco se trata de una compensación menor a la fijada para horas regulares, pues conforme se revolvió en *Encarnación v. Jordán*, 78 DPR 505, 513 (1955), ésta se refiere al salario convenido, al salario mínimo fijado para la ocupación, industria o negocio en cuestión, y a falta de otro, al salario que suele pagarse en la localidad por trabajos similares. *Salgado v. Tribunal Superior*, 92 DPR 367, 372 (1965).

Por otro lado, el Departamento del Trabajo y Recursos Humanos promulgó el Reglamento Núm. 13, a los fines de definir los términos "Administrador", "Ejecutivo" y "Profesional". Dispone, pues, que los empleados que realicen funciones de acuerdo a los términos definidos quedan exentos de las disposiciones, entre otras, de la Ley Núm. 379, *supra*.

Atinente a nuestra controversia, el Artículo V del aludido Reglamento establece que el término "Administrador" significa todo empleado que: (1) recibe una compensación a base de su salario no

menor de $455.00 semanales; (2) cuya función primordial sea el realizar trabajo de oficina; y (3) posean ejercicio de discreción y juicio independiente con relación a asuntos de importancia.

Igualmente, el Artículo VII establece que el término "Profesional" significa todo empleado que: (1) recibe una compensación a base de su salario no menor de $455.00 semanales; (2) y el cargo de su función requiere de conocimientos avanzados en alguna profesión o materia, los cuales fueron adquiridos a través de estudios prolongados de instrucción y de estudio intelectual especializado. Cabe resaltar que, el hecho de que un empleado pueda ser considerado exento bajo más de una excepción, de conformidad con el referido Reglamento, ello no afecta su estatus de exento bajo cada una de ellas en particular.

Nuestro Máximo Foro ha expresado que, la determinación de si un empleado cae bajo alguno de los referidos términos, dependerá de la concurrencia de todos los requisitos enumerados en la referida disposición reglamentaria. *Malavé v. Oriental*, 167 DPR 593, 602 (2006). "La exclusión de un empleado de los beneficios reconocidos en la legislación laboral debe ser clara y debe interpretarse restrictivamente." *Íd.* Al hacer dicha determinación, debemos analizar las funciones que efectivamente realiza cada empleado y no el título del puesto que ocupa. *Íd.*

### F. Defense Base Act

El Defense Base Act (DBA), 42 USC sec. 1651 *et seq.*, es una ley federal que extiende las disposiciones de la Ley de Compensación para Trabajadores de Muelles y Puertos (Longshore and Harbor Workers' Compensation Act, 33 USC sec. 901 *et seq.*), para brindar protección de compensación laboral a los empleados civiles que trabajan fuera de los Estados Unidos, en bases militares o en virtud de un contrato con el gobierno de los Estados Unidos, para obras públicas o para la defensa nacional. Esta legislación, tiene el

propósito de asegurar al empleado una compensación justa por los daños sufridos a consecuencia de accidentes, sea lesión o muerte, en el desempeño de su trabajo.

En particular, el inciso (a) de la referida ley, 42 USC sec. 1651(a), establece que sus disposiciones serán de aplicación en los siguientes casos:

(1)  [...]

(2)  [...]

(3)  upon any public work in any Territory or possession outside the continental United States (including the United States Naval Operating Base, Guantanamo Bay, Cuba; and the Canal Zone), if such employee is engaged in employment at such place under the contract of a contractor (or any subcontractor or subordinate subcontractor with respect to the contract of such contractor) with the United States; but nothing in this paragraph shall be construed to apply to any employee of such a contractor or subcontractor who is engaged exclusively in furnishing materials or supplies under his contract;

(4)  under a contract entered into with the United States or any executive department, independent establishment, or agency thereof (including any corporate instrumentality of the United States), or any subcontract, or subordinate contract with respect to such contract, where such contract is to be performed outside the continental United States and at places not within the areas described in subparagraphs (1)-(3) of this subdivision, for the purpose of engaging in public work, and every such contract shall contain provisions requiring that the contractor (and subcontractor or subordinate contractor with respect to such contract) (1) shall, before commencing performance of such contract, provide for securing to or on behalf of employees engaged in such public work under such contract the payment of compensation and other benefits under the provisions of this chapter, and (2) shall maintain in full force and effect during the term of such contract, subcontract, or subordinate contract, or while employees are engaged in work performed thereunder, the said security for the payment of such compensation and benefits, but nothing in this paragraph shall be construed to apply to any employee of such contractor or subcontractor who is engaged exclusively in furnishing materials or supplies under his contract;

(5)  [...]

(6)   [...]

De lo anterior se desprende que, todo empleado que trabaje en un territorio de los Estados Unidos, con el fin de realizar trabajos u obras públicas en virtud de un contrato aprobado y financiado por los Estados Unidos y bajo los parámetros de la DBA, gozará de los beneficios de compensación. Ante ello, el patrono tendrá el deber de garantizar que la cobertura de la DBA se extienda a sus contratistas y, respectivamente, a sus empleados.

Por su parte, la DBA establece un principio de exclusividad de remedio, el cual protege a los patronos contra causas de acción incoadas en su contra por accidentes ocurridos a empleados dentro de las funciones del empleo. 42 USC sec. 1651(c). Dicha doctrina tiene el propósito de equilibrar los intereses entre empleadores y empleados, proporcionando una compensación garantizada para sus empleados, a su vez que, provee inmunidad al patrono contra cualquier reclamación. *Director, OWCP v. Perini North River Assocs.*, 459 US 297 (1983). Así pues, el inciso (c) de la referida ley, cita de la siguiente manera:

> The liability of an employer, contractor (or any subcontractor or subordinate subcontractor with respect to the contract of such contractor) under this chapter shall be exclusive and in place of all other liability of such employer, contractor, subcontractor, or subordinate contractor to his employees (and their dependents) coming within the purview of this chapter, under the workmen's compensation law of any State, Territory, or other jurisdiction, irrespective of the place where the contract of hire of any such employee may have been made or entered into. 42 USC sec. 1651(c).

La DBA está diseñada típicamente para ser un remedio exclusivo, por lo que, al aceptar los beneficios provistos por esta, un empleado implícitamente renuncia al derecho de perseguir otras reclamaciones legales contra su patrono, relacionadas a lesiones o muerte en el trabajo. *Íd.* En otras palabras, si un empleado cubierto por la DBA sufre una lesión mientras labora en Puerto Rico, en virtud de un contrato con los Estados Unidos para realizar obras

públicas, ese empleado queda principalmente obligado por las disposiciones de la DBA para beneficios de compensación. Empero, es preciso destacar que, aunque la DBA proporciona un remedio exclusivo, nada impide que el empleado lesionado persiga reclamaciones contra terceros cuya negligencia haya contribuido a la lesión. *Sun Ship, Inc. v. Pensylvania*, 447 US 715 (1980).

### III

En el ejercicio de nuestra función revisora, nos corresponde: 1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra*, y la jurisprudencia le exigen al foro primario; 2) revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36, *supra*; 3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos; 4) y de encontrar que los hechos materiales realmente están incontrovertidos, revisar de *novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia.[13]

De un ponderado análisis del expediente ante nuestra consideración, surge que, la parte peticionaria en su *Moción de Sentencia Sumaria* cumplió con las formalidades dispuestas por la Regla 36 de Procedimiento Civil, *supra*. De igual manera, cumplió la parte recurrida en su *Moción en Oposición a Moción de Sentencia Sumaria*. Puesto que, en la solicitud de sentencia sumaria, la parte peticionaria, incluyó las alegaciones de las partes, realizó una enumeración de hechos sobre los cuales entendía eran incontrovertidos, de manera detallada, separada y sustentada.

---

[13] *Roldán Flores v. M. Cuebas, Inc.*, supra, pág. 679.

Asimismo, hizo referencia a declaraciones juradas y otros documentos que obran en el expediente.  En cuanto a la oposición, la parte recurrida hizo referencia a la prueba documental que entendía que controvertía los hechos alegados por la parte contraria e indicó los párrafos a los que hacía referencia.[14]

Superado este análisis, en el caso ante nos, la parte peticionaria nos solicita que revoquemos el dictamen emitido por el foro *a quo*, en el cual declaró No Ha Lugar su *Moción de Sentencia Sumaria.* Específicamente, sostiene dicha parte que incidió el foro primario: (1) al no tomar como incontrovertidos los hechos esbozados en su moción, los cuales fueron admitidos por la parte recurrida en su oposición, así como los que no fueron debidamente controvertidos; y (2) al declarar No Ha Lugar la solicitud de sentencia sumaria, bajo el fundamento de que la prueba presentada era insuficiente para resolver el asunto por la vía sumaria. De entrada, advertimos que no le asiste la razón a la parte peticionaria. Veamos.

En cumplimiento con la normativa vigente sobre la sentencia sumaria, evaluamos *de novo* las determinaciones de hechos esbozadas por el foro primario y las acogemos, por no estar en controversia y estar basadas en evidencia suficiente. Cónsono con el análisis correspondiente, coincidimos con las determinaciones de hecho esbozadas por el foro *a quo*, por lo que, procedemos a transcribir las mismas, tal cual:

**DETERMINACIONES DE HECHOS INCONTROVERTIDAS**

1.  DDI y DEI son compañías hermanas que pertenecen a la misma empresa matriz denominada The Dewberry Companies, Inc.

2.  The Dewberry Companies, Inc., no rinde servicios y no tiene empleados.

3.  NISTAC E, LLC. es una compañía de responsabilidad limitada con dos (2) miembros.

---

[14] 32 LPRA Ap. V, R. 36.3(b); *SLG Fernández-Bernal v. RAD-MAN et al.*, supra, pág. 15.

Además, era uno de cuatro (4) Contratistas de Asistencia Técnica ("Technical Assistance Contractors" o "TACS") en "stand-by" retenidos por FEMA para proveer apoyo en recuperación de desastres bajo el Programa de Asistencia Pública federal.

4. AECOM y DEI son socias en el NISTAC Joint Venture.

5. DEI se hizo socia de NISTAC E, LLC., como sucesora en interés de Dewberry & Davis LLC, una compañía de responsabilidad limitada del estado de Virginia.

6. AECOM era originalmente URS Group, Inc., quien junto a Dewberry & Davis LLC, formaban parte del NISTAC Joint Venture.

7. DDI nunca obtuvo autorización para hacer negocios en Puerto Rico.

8. DEI es una corporación organizada bajo las leyes del Estado de Nueva York y autorizada como corporación foránea a hacer negocios en Puerto Rico.

9. DDI y DEI tenían vigente para las fechas en que ocurrieron los hechos relevantes al caso de autos un "Management Services Agreement" mediante el cual DDI acordó proveer empleados profesionales y técnicos a DEI.

10. Bajo el "Management Services Agreement", DDI era el patrono de los empleados profesionales y técnicos, a los efectos del pago de salarios, beneficios complementarios, beneficios de jubilación y cualquier impuesto que surgiera de la relación patrono-empleado.

11. El objetivo de la Orden de Trabajo FEMA-DR-4339-PR era movilizar personal técnico a Puerto Rico para llevar a cabo visitas a lugares o facilidades destruidas o dañadas por el Huracán María, elaborar descripciones detalladas de los daños y dimensiones de las instalaciones o infraestructuras dañadas, preparar los alcances de los trabajos necesarios para reparar las facilidades o instalaciones, realizar inspecciones del lugar, elaborar estimados de costos de reparación y restauración, prestar apoyo a la mitigación de daños, y proporcionar individuos para ayudar a FEMA con la presentación de informes, con el propósito de implementar el Programa de Asistencia Pública federal de FEMA.

12. Para la Orden de Trabajo de FEMA-DR-4399-PR, NISTAC movilizó a Puerto Rico aproximadamente ochenta y un (81) recursos para ocupar puestos técnicos.

13. Para la fecha de los eventos y al presente, el Sr. Mark Montgomery es empleado de DEI y era la persona encargada de aprobar la contratación de los empleados que iban a ser asignados a trabajar en Puerto Rico.

14. El querellante, Sr. John Edward Herzog tiene sobre veinte (20) años de experiencia de trabajo en manejo de proyectos en desarrollo de tierra, permisos, cumplimiento, calidad, control de calidad como contratista o subcontratista, así como en programas de gobierno. Asimismo, ha trabajado en programas del gobierno federal con el Departamento de Defensa, el Negociado de Reclamaciones, el Departamento del Interior y clientes de esa naturaleza en proyectos de construcción, ambientales, permisos y cumplimiento, así como en proyectos de diseño de plantas de tratamiento de agua, tecnología de control geotécnico y distribución de agua.

15. El 26 de marzo de 2018, el querellante recibió una oferta de empleo de DEI para trabajar a tiempo parcial (part-time employment) como "Emergency Management Specialist".

16. El Sr. John Edward Herzog aceptó la oferta de empleo cursada por DEI mediante firma digital el 27 de marzo de 2018.

17. El Sr. Mark Montgomery era el Deputy Project Director del proyecto al cual el querellante fue asignado cuando comenzó su empleo con DEI.

18. El querellante John Edward Herzog fue movilizado (deployed) a Puerto Rico para trabajar con NISTAC en el proyecto de recuperación de desastre FEMADR-4399-PR. FEMA le emitió una notificación titulada "Deployment Request Report - You are Deployed".

19. En la notificación titulada "Deployment Request Report - You are Deployed" se indicaba que la fecha en la cual el querellante debía llegar al proyecto era el 27 de junio de 2018, que la duración de este era 279 días y su fecha de salida esperada era el 1 de abril de 2019.

20. El Sr. John Edward Herzog realizaba trabajo de estimación de costo como parte del Grupo de Estimación de Costos de FEMA ("Cost Estimating Group" o "CEG").

21. La clasificación provista al querellante Sr. John Edward Herzog por FEMA era de Especialista Técnico ("Technical Specialist").

22. En el Grupo de Estimación de Costos de FEMA, el querellante realizó estimaciones de costos para todos los grupos principales de infraestructura. Trabajó estimaciones para infraestructuras de

transporte, acueductos públicos, edificios públicos.

23. En la labor de estimación de costos, el Sr. John Edward Herzog desarrollaba un alcance de trabajo, hacía preguntas, solicitaba información y estimaba cuál sería la reparación o el reemplazo, utilizando varias herramientas, una de ellas era una base de datos nacional de costo económico, o RS Means.

24. La Orden de Trabajo de FEMA-DR-4399-PR requería que se trabajara sesenta (60) horas a la semana por un período de al menos un (1) año.

25. Generalmente, el John Edward Herzog trabajaba entre cincuenta (50) a cincuenta a cinco (55) horas semanales de no haber un día feriado o día que FEMA informara que no se iba a trabajar.

26. El querellante John Edward Herzog devengaba un salario fijo de $3,000.00 semanales, recibía un estipendio para comida y reembolsos de gastos *(per diem)* y un pago adicional por horas extras sobre las cuarenta (40) horas, a razón de 1/40 de su salario semanal.

27. El Sr. John Edward Herzog tenía que completar una hoja de tiempo diaria indicando la cantidad de horas trabajadas en el día para el proyecto, ya que el cliente (FEMA) lo requería para poder facturarle los servicios.

28. Como parte de sus funciones en el empleo el Sr. John Edward Herzog no supervisaba empleados, ni participaba en el reclutamiento de éstos y tampoco tenía facultad para despedirlos o tomar medidas disciplinarias.

29. El Contrato PA-TAC y la Orden de Trabajo FEMA-DR-4399-PR disponían un límite máximo de horas de labor autorizadas para rembolso y un límite máximo de fondos asignados al proyecto.

30. Los empleados exentos y los no exentos tenían que completar el mismo formulario de hojas de trabajo *(timesheets).*

31. La Sra. Sandra Smith se reportaba directamente al Sr. Mark Montgomery y era la que aprobaba las hojas de horas de trabajo del Sr. John Edward Herzog.

32. Según se les instruyó a los empleados de DEI, en caso de una pregunta relacionada con Dewberry, estos debían acudir en primera instancia a su TAC Coordinator, que en el caso de John Herzog era William Riggs, y si este no podía contestar la pregunta, entonces estos podían acudir a donde Mark Montgomery.

33. El Sr. William Riggs laboraba como empleado a tiempo parcial (part time) de DEI como "TAC coordinator". Además, era considerado por Dewberry como un empleado no exento.

34. DDI era la entidad que pagaba los salarios de John Herzog y según surge de los avisos de pagos, la dirección de DDI era la misma de DEI, apareciendo la dirección de esta última como la del remitente.

35. El contrato de PA-TAC entre FEMA y NISTAC había sido enmendado por FEMA efectivo el 3 de abril 2018, ("Amendment of Solicitation / Modification of Contract") para incorporar la cláusula del "Federal Acquisition Regulation 52.228-3" y requerirle a NISTAC tener una póliza de seguro de accidentes del trabajo bajo el Defense Base Act.

36. El Sr. Mark Montgomery conocía que el requisito de FEMA de tener la póliza bajo el Defense Base Act era parte del contrato PAC-TAC entre NISTAC y FEMA, que expresamente requirió dicha cubierta. El señor Montgomery lo supo cuando FEMA emitió la Orden de Trabajo FEMA-DR-4399-PR (Huracán María) en abril de 2018.

37. El 15 de octubre de 2018, el Departamento del Trabajo de los Estados Unidos, Office of Workers Compensation Programs emitió la notificación "Industry Notice No. 169", para aclarar que a todo contratista federal trabajando en Puerto Rico en la recuperación de desastres post huracanes Irma y María se le requería tener la cubierta del Defense Base Act para cubrir accidentes del trabajo de sus empleados laborando en Puerto Rico; y que dichos contratos federales tenían que contener una cláusula requiriendo la cobertura del Defense Base Act.

38. El sábado, 6 de abril de 2019, en horas de trabajo, aproximadamente a las 12:00 p.m., el querellante John Edward Herzog tropezó mientras bajaba unas escaleras en el FEMA ANNEX Center, en la Carretera 165 en Guaynabo, donde ubicaban las oficinas del patrono. Como consecuencia del tropiezo, el querellante sufrió una caída que le provocó una fractura de muñeca, por la cual estuvo enyesado del 8 de abril de 2019 al 22 de mayo de 2019. Luego de que le removieran el yeso, el querellante estuvo en terapias de rehabilitación desde mayo hasta octubre 2019.

39. El querellante recibió servicios médicos para atender su fractura de la muñeca izquierda en el Hospital Auxilio Mutuo, en las oficinas del Dr. Héctor Pagán Marrero, MRN Therapy, Quadrangle Imaging Center. El Dr. Pagán no le ordenó reposo.

40. El Sr. Mark Montgomery advino en conocimiento que el querellante John Edward Herzog se había lesionado en el trabajo el día después del accidente,

es decir, domingo 7 de abril de 2019, luego de que el querellante buscara atención médica.

41. El querellante no trabajó el lunes, 8 de abril de 2019, pero sí trabajó el resto de la semana siguiente al accidente, de martes a viernes.

42. Después del accidente, el querellante continuó trabajando, pero en unas horas más reducidas en ciertos días de mayo de 2019; y no trabajó los sábados debido a sus terapias. Asimismo, hubo uno o dos días que el querellante no trabajó[,] sino que permaneció en descanso por su lesión.

43. El 14 de abril de 2019, el querellante le escribió nuevamente al patrono presentándole el formulario de beneficios por el accidente del trabajo del 6 de abril de 2019 y envió otras comunicaciones de seguimiento a su reclamación, dirigidas al coordinador del patrono en Puerto Rico y a su supervisor directo.

44. El 15 de abril del 2019, el querellante John Edward Herzog sometió un borrador del formulario LS-202 del United States Department of Labor ("USDOL") a su TAC coordinator William Riggs, quien a su vez se lo proveyó a su supervisor, el Sr. Mark Montgomery.

45. El querellante hizo solicitudes adicionales a su patrono en cuanto los documentos cumplimentados y radicados para su reclamación de compensación de empleado ("workers' compensation") y el 7 de mayo de 2019, le envió un correo electrónico al Sr. William Riggs indicándole que nada había pasado con su reclamación. Este último envió un correo electrónico al señor Montgomery sobre la falta de acción en torno a la reclamación del querellante.

46. El 10 de mayo de 2019, el Sr. William Riggs le envió un segundo correo electrónico al Sr. Mark Montgomery sobre la falta de acción de la reclamación del querellante.

47. El 13 de mayo de 2019, el querellante John Edward Herzog le envió un correo electrónico al Sr. Mark Montgomery, solicitando la información de contacto del coordinador de la reclamación.

48. Durante una reunión llevada a cabo el 6 de junio de 2019, entre el querellante, Lonnie Hill de FEMA y la Sra. Stephanie Coppock, "NISTAC Tac coordinator", el querellante les informó que aún estaba bajo tratamiento con su doctor y tomando terapias físicas, bajo el workers' compensation.

49. NISTAC/Dewberry no habían sido dispensados por la CFSE de su obligación de asegurar a sus empleados bajo dicha entidad, para cubrir los accidentes en el empleo.

50. Bajo el contrato NISTAC Joint Venture, no se hizo ningún trabajo en una base militar en Puerto Rico.

51. El 6 de junio de 2019, el Sr. Mark Montgomery le notificó al querellante John Edward Herzog que sería desmovilizado del proyecto ese mismo día y dio por terminada la relación de empleo.

52. El 6 de junio de 2019, el querellante fue despedido de su empleo sin aviso escrito de terminación de empleo por el Sr. Mark Montgomery y DEI, ni justificación escrita por parte de FEMA.

53. Nunca hubo una queja sobre el desempeño el querellante en su trabajo en DEI como técnico especialista y experto en habilidades geotécnicas.

54. El querellante John Herzog en ningún momento fue colocado bajo un programa de mejora de rendimiento, antes o después del accidente que sufriera el 6 de abril del 2019.

55. El Sr. Mark Montgomery nunca consultó los alegados problemas de actitud del querellante, con Davis Francis, Director de Recursos Humanos y Cumplimiento de Dewberry.

Con relación al primer señalamiento de error, la Regla 36.3 (d) de Procedimiento Civil, *supra*, le concede al tribunal la potestad de excluir aquellos hechos propuestos por cualquiera de las partes que no hayan sido debidamente numerados o *que no tengan correlación específica a la evidencia admisible que supuestamente los sostiene*.[15] De igual manera, aunque en el proceso de considerar una solicitud de sentencia sumaria el tribunal retiene la discreción de examinar evidencia admisible que obre en los autos, pero que ha sido omitida por las partes, éste no viene obligado a hacerlo.

Al examinar la *Moción de Sentencia Sumaria* y su oposición, encontramos que los documentos presentados por la parte peticionaria para sustentar los hechos propuestos en su moción no son suficientes para acoger todos los hechos propuestos como hechos incontrovertidos. Si bien la parte recurrida los tomó como admitidos en su oposición, el foro primario tiene discreción para

---

[15] 32 LPRA Ap. V, R. 36.3(d).

excluir aquellos hechos que, a su juicio, no están sustentados por la prueba documental. En particular, los treinta y cinco (35) hechos propuestos por Dewberry[16], que no fueron acogidos como incontrovertidos por el foro de primera instancia, no están sustentados con prueba suficiente. Concurrimos con el *foro a quo*, en que los mismos involucran asuntos que ameritan ser sustentados mediante prueba, a esos efectos e incluso, envuelven asuntos de credibilidad. Por consiguiente, colegimos que, el primer error señalado no fue cometido.

En la discusión del segundo señalamiento de error, Dewberry –para sustentar sus argumentos– arguye que: (1) la parte recurrida es un empleado exento, por lo que no tiene derecho al pago de horas extras ni por periodo de alimentos; (2) la parte peticionaria es un patrono asegurado por la DBA, por lo cual goza de inmunidad ante cualquier reclamación derivada del accidente ocurrido en el trabajo, al amparo de la Ley Núm. 45, *supra*; (3) la parte recurrida no tiene una causa de acción por despido injustificado bajo la Ley Núm. 80, *supra*.

En lo concerniente al primer argumento, acota la parte peticionaria que, el señor Herzog es un empleado altamente compensado y que cumple con los requisitos para ser considerado un "Profesional" de conocimiento avanzado en ciencias geológicas, así como un "Administrador"; de modo que, no le es de aplicación las disposiciones de la Ley Núm. 379, *supra*. En cuanto al segundo argumento, sostiene que, al estar asegurado por la DBA, la parte recurrida está impedida de reclamar compensación bajo leyes estatales. Por último, apunta que no procede una causa de acción bajo la Ley Núm. 80, *supra*, toda vez que, el señor Herzog fue contratado por tiempo determinado; y, que, de aun entenderse que

---

[16] La parte peticionaria estableció un total de ciento veintiún (121) hechos esenciales y pertinentes sobre los cuales entendió que no existía controversia.

fue contratado por un término indefinido, este fue despedido antes de que se cumpliera el periodo probatorio automático de doce (12) meses que dispone la referida ley.

En respuesta, la parte recurrida plantea en su oposición que, la oferta de empleo que le fue cursada no establecía un término definido de duración de empleo; que como parte de las funciones de su empleo no figuraba supervisar a otros empleados, ni tenía la facultad para despedir o tomar medidas disciplinarias en contra de estos; y que tenía un horario de trabajo establecido, por lo que, no cumplía con los requisitos para ser considerado un empleado exento. Arguye, además, que, al momento de la ocurrencia del accidente, Dewberry no contaba con una póliza de seguros vigente a su favor, ni con el DBA ni con la de la CFSE, de modo que, tenía derecho a reclamar compensación bajo la ley Núm. 45, *supra.* Por último, apuntó que no solo fue despedido sin justa causa en violación a lo dispuesto en la Ley Núm. 80, *supra,* sino también ilegalmente por represalias.

Conforme al derecho reseñado, no procederá dictar sentencia sumaria cuando *surja de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material y esencial o porque como cuestión de derecho, no proceda.*[17] En el caso ante nos, el foro primario determinó que no procedía resolver las causas de acción sumariamente, toda vez que, los documentos acompañados con la solicitud de sentencia sumaria eran insuficientes para resolver las controversias. De esta manera, formuló las siguientes **Determinaciones de Hechos en Controversia**:

1.    Quién era el patrono del querellante John Edward Herzog.

2.    Si aplica o no la doctrina de patrono único.

---

[17] *SLG Fernández-Bernal v. RAD-MAN,* supra, pág. 14; *Serrano Picón v. Multinational Life Ins.*, supra.

3. Si el querellante John Edward Herzog era un empleado exento o no exento.

4. Si el querellante John Edward Herzog era un empleado regular por tiempo indefinido o por un término fijo.

5. Si se le adeuda o no al querellante una compensación adecuada por horas extras no pagadas.

6. Si el querellante John Edward Herzog fue despedido sin justa causa.

7. Si el despido del querellante John Edward Herzog fue o no en represalia por su reclamación debido a su accidente ocupacional de conformidad.

8. Si el patrono del querellante John Edward Herzog estaba asegurado o no bajo una póliza conforme el Defense Base Act que cubría el accidente ocupacional.

9. Si el patrono del querellante John Edward Herzog tenía o no la obligación legal de obtener una póliza con el Fondo.

10. Si el patrono del querellante gozaba o no de inmunidad patronal.

Al revisar de *novo* el expediente ante nuestra consideración, concordamos con el foro primario en que, en el caso ante nos existen controversias de hechos materiales –las cuales acogemos– que impiden dictar sentencia sumaria a favor de la parte peticionaria. Mas aun, cuando las controversias involucran aspectos de credibilidad que ameritan la celebración de un juicio en su fondo. En fin, nos es forzoso concluir que, la prueba documental presentada es insuficiente para resolver todas las controversias sumariamente. Resolvemos, pues, que no incidió el foro *a quo* al declarar No Ha Lugar la *Moción de Sentencia Sumaria*; en esencia, el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia.

**IV**

Por los fundamentos que anteceden, *expedimos* el recurso de *Certiorari* y confirmamos el dictamen recurrido.

Notifíquese.

Lo acordó y manda el Tribunal, y certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones